FILED

08/30/2022

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 2, 2022

IN RE JAMARCUS K. ET AL.

Appeal from the Juvenile Court for Dickson County
No. 03-20-025-TPR          Michael Meise, Judge

_____

No. M2021-01171-COA-R3-PT
_____

The parental rights of Taleada K. ("Mother") and Lashaun K. ("Father") were terminated by the Juvenile Court for Dickson County on September 8, 2021. Both parents appeal. We affirm the termination of both parents' parental rights to all four of the children for severe abuse, abandonment by failure to provide a suitable home, persistence of conditions, and failure to manifest an ability and willingness to assume custody. We reverse the juvenile court's ruling that Mother's parental rights should be terminated for abandonment by failure to support. We vacate the juvenile court's conclusion that Mother's and Father's parental rights are terminated for substantial noncompliance with the permanency plan. We affirm the juvenile court's conclusion that termination is in the children's best interests and, accordingly, affirm the overall ruling that Mother's and Father's parental rights are terminated.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Taleada K.

Blake Kruse, Dickson, Tennessee, for the appellant, Lashaun K.

Herbert H. Slatery III, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General for the appellee, Tennessee Department of Children's Services.

OPINION

BACKGROUND

This appeal concerns Mother's and Father's parental rights to four minor children – J.D.K., L.K., D.K., and J.M.K,[1] (together "the Children"), all of whom were teenagers by the time of trial. The family became involved with the Juvenile Court for Dickson County (the "trial court") in April of 2019 due to the Children being truant from school. At the time, Mother, Father, and all four children were living in a one-bedroom RV that was approximately two hundred fifty square feet. A family services case was opened, and on April 3, 2019, both Mother and Father tested positive for methamphetamine and ecstasy. A hair follicle test performed on both parents later in April of 2019 confirmed the presence of methamphetamine in their systems. Additionally, hair follicle tests performed on all four children[2] on April 17, 2019 were positive for methamphetamine. The Children were placed in DCS custody on May 1, 2019, per a bench order. A preliminary hearing regarding dependency and neglect was set for May 8, 2019, but both parents waived the hearing. An adjudicatory hearing was held on October 4, 2019. Mother was an hour late to this hearing, and Father did not attend. The trial court adjudicated the Children dependent and neglected by both parents and concluded that the Children were severely abused based on the Children's positive drug screens. Though both Mother and Father had counsel, this ruling was never appealed.

The initial permanency plan was entered on May 24, 2019, and had an expected completion date of November 21, 2019. The goal of the initial plan was return to parent or exit custody with a relative. The primary focus of the plan was the parents' drug use. The plan required both Mother and Father to have an alcohol and drug ("A&D") assessment and follow all recommendations; submit to hair follicle testing by DCS; submit to and pass any random drug screens by DCS; release information from providers to DCS; and have a parenting assessment through Health Connect. Mother completed her parenting assessment early on, the results being that Mother had a bond with the Children but needed to prioritize the Children over her substance abuse. The recommendations from Mother's parenting assessment were continuing drug screens and family support services. It was also recommended that Mother get her driver's license reinstated. Additionally, Mother was required to participate in domestic violence classes, as she was accused of having stabbed Father and/or shot him in the leg on a previous occasion. The plan also provided for bi-weekly visitation, and DCS was supposed to provide Mother and Father with gas cards because the Children were placed in Jackson, Tennessee. Mother and Father were ordered to pay one-hundred dollars in child support collectively each month.

A new permanency plan was created on November 21, 2019. The update on the family as of that date provided that Mother and Father had both repeatedly refused to submit to drug screens. Mother had been tested three times – she was positive for

---

[1] In actions involving juveniles, it is this Court's policy to protect the privacy of the children by using only the first name and last initial, or only the initials, of the parties involved.

[2] The record contains only the hair follicle test results for J.D.K, L.K, and D.K. Nonetheless, DCS maintained throughout the case that all four children tested positive for methamphetamine in April of 2019, and the parents have not disputed this or raised this as an issue on appeal.

methamphetamine on October 4, 2019, negative for all substances on October 9, 2019, and positive for methamphetamine on November 21, 2019. Mother had completed her domestic violence class; however, Mother was then arrested on October 28, 2019, after an altercation with Father. Mother was charged with domestic assault as a result.

Mother had also completed the A&D assessment as well as a psychological assessment. The follow-up recommendations were an intensive outpatient program ("IOP") and ongoing therapy. Mother made an appointment with the family's DCS caseworker, Michael Doncouse, on November 13, 2019, to get help calling providers, but Mother was not present at the family's RV when Mr. Doncouse arrived for the meeting.

Father was screened for drugs on October 9, 2019 and October 30, 2019, and was negative for all substances. Like Mother, the follow-up recommendations to Father's A&D assessment were an IOP as well as mental health counseling. However, Father told the family's services worker ("FSW") on November 15, 2019, that Father was not completing any more services until the Children returned home.

The November 2019 permanency plan had largely the same goals and tasks, with the added requirement that both Mother and Father attend an IOP and that Mother contact the facilities on a list given to her. Mother was also asked to complete additional domestic violence classes at Camelot due to the new assault charges. Further, because a no-contact order was entered between Mother and Father because of the criminal case against Mother, visitation became complicated. DCS notes provide, however, that when the parents attended visitation, it was positive. In the interim, the Children were placed in two separate foster homes and were all attending therapy. It was reported that L.K. and J.D.K. had severe anger issues and that D.K. struggled with ADHD.

DCS filed its petition to terminate Mother's and Father's parental rights to all four Children on March 10, 2020. The grounds alleged as to both parents were severe abuse, abandonment by failure to pay support, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, persistence of conditions, and failure to manifest an ability and willingness to assume custody of the Children. Trial was continued several times, and the Children remained in foster care.

The next permanency plan was ratified on May 20, 2020. By this point, the parents' in-person visitation had been disrupted by the COVID-19 pandemic, and they were exercising visitation over the phone and via Skype. According to the May 2020 permanency plan, Mother and Father had virtual visitation on the first and third Thursday of every month. While the parents' visitation became inconsistent after the switch to virtual visitation, Mr. Doncouse agreed at trial that this was often due to technological issues and the parents' internet access. In May of 2020, Mother reported to DCS that she was in mental health treatment at Centerstone and that she planned on completing her additional domestic violence classes. Mother also reported that she was working on procuring a five-

bedroom home for the family in Waverly but that it needed electrical work. The FSW provided the family with a housing authority application, but it does not seem this was ever completed. DCS had concerns about the parents' living situation because their RV was not suitable for six people, including four teenagers, and because the parents had apparently been homeless and living at a boat dock at one point. Additionally, by May of 2020, neither parent had submitted to a hair follicle drug screen as required by the permanency plan, nor had they completed an IOP. Father had completed the intake process for an IOP but failed to actually begin the program. While Mr. Doncouse had at one point arranged for Mother to do a rehabilitation program at Buffalo Valley, she discharged herself after two days.

Further, since the previous update in November of 2019, Mother had tested positive for methamphetamine twice and refused to screen on other occasions. The record contains less information regarding Father during early 2020, but it was noted that Father refused a drug screen on March 6, 2020. Overall, the record shows that as of May 2020, Mother and Father were still struggling with the primary issue underpinning the Children's removal, namely, substance abuse. Meanwhile, it was reported that the Children were all struggling in school, and that D.K. and J.D.K. were failing some of their classes. It was also reported that adoption had been discussed with the Children and that they were upset at their parents for not completing the permanency plan tasks.

An FSW conducted home visits at Mother's and Father's RV on June 22, 2020 and July 28, 2020. Father was not present on June 22, 2020, and could not be screened. Mother was screened, however, and tested negative for all substances. During the July 28, 2020 visit, Father would not come out of the RV to be screened, and Mother refused to be screened because she reported she had taken Phentermine. Also during the July visit, the FSW helped Mother get in contact with an IOP and make an appointment. The FSW discovered later that Mother did not go to the appointment. Accordingly, the next permanency plan ratified by the trial court, which was entered September 9, 2020, required the parents to complete an IOP, follow all recommendations, and submit to a hair follicle drug test.

The final permanency plan in the record is dated October 26, 2020. It contained largely the same requirements as the previous plans. The October plan provides that Mother tested positive for methamphetamine during her last drug screen and that Father tested positive for THC during his last drug screen. Mother was discharged from her mental health therapy for noncompliance and failing to keep her appointments. Moreover, Mother had a warrant out for her arrest for violations of probation and failure to appear.

Trial on the petition for termination was held on July 10, 2021. Mother, Father, and FSW Doncouse all testified. Generally, Mother's testimony provided that she had a strong bond with all of the Children and wanted them returned to her. Mother was, however,

incarcerated at the time of trial for violations of probation[3] and what she called an "escape" charge, which Mother stated arose out of confusion over furlough time. She testified that she had completed a thirty-day rehabilitation program at Mirror Lake in February of 2021 and left when she was done, which led to her "escape" charge. Notably, Mother testified that while she would likely be offered the opportunity to go to rehab in lieu of additional jail time, she planned instead to stay in jail and "flatten" her sentence. Mother stated that she would rather do this because she would be released sooner than she would be if she went back to rehab and because she would not have to do any probation. Mother stated that she struggled on probation and was concerned she would violate it.

Mother's records from Mirror Lake provided that she had been diagnosed with Bipolar I, depressive disorder, generalized anxiety disorder, and severe amphetamine-type substance use disorder. While Mirror Lake had prescribed Mother several medications upon her discharge, Mother testified that she was not taking them because she did not like medicating herself. Mother denied having any mental health issues. Regarding the fact that the Children had tested positive for methamphetamine upon coming into DCS custody, Mother denied that the exposure occurred in her home and stated that the Children sometimes spent the night at friends' homes. Although Mother was incarcerated at the time of trial, she testified that she and Father still lived in the RV park in Dickson and that Mother was employed as the groundskeeper there. This paid for Mother's and Father's rent, and this job was always available to Mother because her mother ran the RV park. Mother also testified that she sometimes helped Father when he had jobs pouring concrete, but she primarily was a stay at home mom. While Mother claimed to have obtained a five-bedroom home in Waverly, she stated it was not ready to move into, and she could not recall the address or from whom she planned to rent the house.

Although Mother denied that the Children were exposed to methamphetamine by her and Father, Mother was generally remorseful about the situation and adamantly maintained to the court that she would stay out of trouble if the Children were returned to her. Mother was also adamant that she had sent money and items for the Children to their respective foster parents throughout the custodial period.

Father's testimony largely corroborated Mother's testimony, and he maintained that he missed and loved the Children and that the family had a strong bond. Being unable to visit the Children in person because of COVID-19 restrictions had taken a toll on both Mother and Father. Father also testified that he and Mother worked in the RV park and that he could get jobs pouring concrete through local companies when weather permitted. These jobs typically paid about two hundred dollars per day.

Regarding the permanency plans, Father testified that he had completed an A&D assessment and a parenting assessment. He also stated that he looked into an IOP, but it

---

[3] Mother testified that the original probation arose from a simple possession charge.

was four days a week for six weeks and he did not have transportation. Father had not had a driver's license for many years and was afraid to drive without one. Throughout the case, Father depended on DCS and his adult daughter for rides, which Father maintained was a significant barrier to completing his permanency plan. In that vein, Father admitted the tasks were incomplete but claimed it was unintentional.

Mr. Doncouse agreed with Father that transportation was a problem throughout the case, noting that neither Mother nor Father had a driver's license and that the Children's foster homes were in Jackson, Tennessee. While Mr. Doncouse testified that he offered rides and gave rides when he could, it was a difficult situation. It was further complicated by the fact that a no-contact order was in place between Mother and Father for a period of time due to Mother's domestic assault charge, and DCS would not transport the parents together. Mr. Doncouse also testified, however, that he initially provided Mother and Father with gas cards and that they failed to turn in their receipts, resulting in the gas cards being revoked. Overall, Mr. Doncouse's primary issues with Mother and Father were that they refused drug screens throughout the case and never completed their IOPs. According to Mr. Doncouse, he spoke with Mother shortly after she was discharged from Mirror Lake in March of 2021, and Mother informed him she would not be completing an IOP. Mr. Doncouse conceded that both parents had a bond with the Children and that COVID-19 restrictions made visitation with the Children difficult.

The trial court entered its final order terminating Mother's and Father's parental rights to all four Children on September 8, 2021. The trial court found that DCS met its burden of proof as to all alleged grounds for termination, other than abandonment by failure to support as to Father. Mother and Father both filed timely appeals to this Court.

ISSUES

On appeal, Mother and Father both raise the single issue of whether termination of their parental rights is in the Children's best interests. Pursuant to our Supreme Court's holding in *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016), however, we also review the statutory grounds for termination.

STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female*

- 6 -

*Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d at 522–23. Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no

presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

## DISCUSSION

## I. Statutory Grounds for Termination

### A. *Severe abuse*

Parental rights may be terminated when "[t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]" Tenn. Code Ann. § 36-1-113(g)(4). Severe abuse includes "[k]nowingly allowing a child to be within a structure where" methamphetamine is "present and accessible to the child." Tenn. Code Ann. § 37-1-102(27)(F).

A finding of severe child abuse is subject to the doctrine of *res judicata*[4] in a termination of parental rights proceeding, "prevent[ing] a parent from re-litigating whether he or she committed severe child abuse when such a finding has been made in a previous dependency and neglect action." *In re S.S.*, No. E2021-00761-COA-R3-PT, 2022 WL 1151424, at *6 (Tenn. Ct. App. Apr. 19, 2022) (citing *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016)); *see also In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *12 (Tenn. Ct. App. Aug. 20, 2020) (holding severe abuse *res judicata* in termination proceeding where mother and DCS were parties to previous dependency and neglect action in which severe abuse was found).

Here, the Children were all adjudicated dependent and neglected by the trial court in October of 2019, and the trial court entered an order concluding that Mother and Father severely abused the Children due to the Children's exposure to methamphetamine. *See In re Sophia S.*, No. E2020-01031-COA-R3-PT, 2021 WL 3236347, at *6 (Tenn. Ct. App. July 30, 2021) ("Generally,'[c]lear and convincing evidence of severe child abuse is present when a child is exposed to methamphetamine.'" (quoting *In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7,

---

[4] *Res judicata* applies when "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *12 (Tenn. Ct. App. Aug. 20, 2020) (quoting *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010)).

2020))). That ruling was never appealed. Whether Mother and Father committed severe abuse against the Children is, therefore, *res judicata*, and we affirm the trial court's decision as to this ground.

### B. Abandonment – Failure to support

The trial court also found that Mother's rights[5] should be terminated based on abandonment through failure to support. *See* Tenn. Code Ann. § 36-1-113(g)(1). Abandonment occurs when:

> [f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).

Abandonment through failure to support occurs when a parent fails, "for a period of four (4) consecutive months, to provide monetary support or . . . more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is support that, "under the circumstances of the individual case, is insignificant given the parent's means[.]" *Id.* § 36-1-102(1)(B). As an affirmative defense, parents facing termination may argue that their failure to support a child was not willful. *Id.* § 36-1-102(1)(I). All parents over the age of eighteen are presumed to know of their legal obligation to support their children. *Id.* § 36-1-102(1)(H).

Regarding Mother, the trial court found as follows:

> In the four months preceding the filing of the Petition, December 9, 2019 through March 9, 2020, the proof showed that [Mother] did not pay any child support. [Mother] admitted that she did not pay child support as ordered, but testified that she did send some money to the children but had no record of that. . . . Mr. Doncouse testified that permanency plans were created for the family and ratified by the Court, with paying child support of

---

[5] The trial court concluded that DCS did not prove this ground with regard to Father, finding that "[he] made some sporadic child support payments and in November 2020 he paid child support arrearages of $1,200.00." DCS does not challenge this ruling on appeal and we need not address it. *See In re Jayce D.*, No. M2021-00539-COA-R3-PT, 2022 WL 817605, at *12 (Tenn. Ct. App. Mar. 18, 2022) (explaining that this Court need not consider the merits of a ground for termination when the party seeking termination does not defend the ground on appeal).

$25.00 per month per child as a task for both parents. Further, that both parents participated in creating the first permanency plan and were aware of the child support obligation. Mr. Doncouse testified that [Mother] has not made any child support payments for the benefit of the children.

The record does not fully support the trial court's findings. Mother testified that she never paid child support through the State of Tennessee but that she frequently sent cash or items to the Children's foster parents through Walmart. Mother was adamant that whenever the Children needed something, she would purchase it for them through Walmart, and that she often asked the Children's foster families what the Children needed. Importantly, Mr. Doncouse did not dispute this and seemed to agree that Mother had sent the Children's respective foster families money and gifts in-kind; specifically, Mr. Doncouse testified:

Q. And so what I'm taking from that is, that when she has the money, she pays what she can towards support?

A. Through child support, like a document through child support, she's paid none. Through -- so, yeah.

Q. But as far as paying something towards the children for their -- like, the money that she was sending to the foster parents or to the children --

A. What we would report to parents is that if you're not paying here, then they can always arrest you. And so whether you pay it to the foster parent or not, we need to pay it through the State. Because if you don't, then you can always be, you know, in contempt. And so . . .

Q. Right. And I understand that, but what I'm getting at to say is, even if she didn't pay through the State, she was still paying what she could, even if it was to the foster parents over a period of time, that may not be reported on the State payment records?

A. I would say she paid, yeah, if that's what –

Q. Okay. All right.

There is little to nothing else in the record addressing Mother's financial support of the Children. Based on the foregoing, however, Mr. Doncouse appeared to acknowledge that Mother sent money to the Children's foster parents even though it did not go through the State's child support office. DCS argues on appeal that Mother never "provided FSW Doncouse with proof of any child-support payments and did not have any such proof at trial[.]" This argument is problematic first because it mischaracterizes the testimony at trial, inasmuch as Mr. Doncouse ultimately agreed with Mother. Mother's proof at trial,

then, was her undisputed testimony. Further, the burden of proof was on DCS to prove that Mother failed to support the Children. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) ("In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence."). In its brief, DCS cites no case law providing that abandonment by failure to support is proven when a parent sends support but does not do so through the child support office. Indeed, our analysis of this statutory ground can include consideration of whether the parent sends in-kind support such as gifts, clothes, etc., directly to a child in foster care. *See, e.g.*, *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *18 (Tenn. Ct. App. July 21, 2021) (reversing trial court's ruling on failure to support when mother consistently gave gifts in-kind to child and foster parent, noting that "[n]othing in the record suggests that DCS informed [m]other that these gifts were inappropriate or insufficient to qualify as support for the children").

Under the circumstances, we conclude that DCS did not prove this statutory ground by clear and convincing evidence. The termination of Mother's parental rights for abandonment by failure to support is therefore reversed.

### C. Abandonment – Failure to provide a suitable home

Abandonment can also occur when:

(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an

early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a)-(c).

Here, we "consider whether a child has a suitable home to return to after the child's court-ordered removal from the parent." *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *3 (Tenn. Ct. App. Mar. 31, 2021). To terminate parental rights under this ground, the trial court must find "that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home entails "[a]ppropriate care and attention" for the child, *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home is "free of drugs and domestic violence." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014). DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *In re Matthew T.*, 2016 WL 1621076, at *7. The Department should utilize its superior resources in assisting with the establishment of a suitable home, but "[its] efforts do not need to be 'Herculean.'" *In re Hannah H.*, 2014 WL 2587397, at *9 (quoting *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015); *see also In re Matthew T.*, 2016 WL 1621076, at *7. Sole responsibility does not lie with DCS, and "[p]arents must also make reasonable efforts towards achieving the goals established by the permanency plan to remedy the conditions leading to the removal of the child." *In re Hannah H.*, 2014 WL 2587397, at *9.

With regard to this ground, the trial court concluded:

The children were placed in the custody of the Department of Children's Services on May 1, 2019. The Juvenile Court's Order removing the children found that reasonable efforts had been made by the Department to prevent the removal as family support services had been working with the family. In the 26 months since the removal, the Department has made reasonable efforts to assist the Respondents in establishing a suitable home for the children. Following the children's placement in state custody, [Mother] did not make reasonable efforts to provide a suitable home for the children. Further,

[Mother's] lack of concern for the children makes it apparent that it is unlikely she will provide a suitable home for the children any time in the near future. [Mother] testified that they lived at Lot Number 88 in the RV park in a very small RV which Mr. Doncouse testified was not appropriate or large enough for the children. [Mother] testified that she has a house in Waverly, Tennessee, but she did not know the address, nor did she have a lease agreement with the owner of that house. [Mother] is currently incarcerated and testified that she would rather be incarcerated than on probation because she felt she would not be able to successfully complete probation.

[Father] testified that he continues to live at Lot 88 at the RV Park from where the children were removed. [Father] testified he has hopes about the house in Waverly as well, but could also not show proof that the housing is suitable. [Father] testified that he has applied to the housing authority but has not been approved yet.

\*       \*       \*

Based on the facts set forth above, the Court concludes and finds that grounds for termination of parental rights do exist as to [Mother] and [Father] by clear and convincing evidence, pursuant to Tenn. Code Ann. [s]ection 36-1-113(g)(1) because [Mother] and [Father] have not made any efforts to provide a suitable home for the minor children. [Mother's] testimony that she would rather remain incarcerated tha[n] be released on probation shows a failure to make even minimal efforts to improve her home and personal condition. [Father's and Mother's] lack of providing a suitable home demonstrates a lack of concern for the children to such a degree that it appears unlikely that they will be able to provide a suitable home for the children at an early date.

Here, we agree with the trial court. The first two elements of section 36-1-102(1)(A)(ii) are not at issue. The Children were removed from the parents' home and placed in DCS custody on May 1, 2019, and were later adjudicated dependent and neglected by the trial court. In an order entered on October 22, 2019, the trial court found that DCS had made reasonable efforts to prevent the Children's removal and reunify the family.

Accordingly, the question is whether DCS made reasonable efforts to assist the parents in establishing a suitable home and whether the parents were able to do so. *Id.* 36-1-102(1)(A)(ii)(c). We agree with the trial court that DCS did, for a period of four months following the Children's removal, attempt to assist parents in establishing a suitable home, but Mother and Father were ultimately unable to do so.

- 13 -

Perhaps most importantly, it was not clear by the time of trial that Mother and Father had stopped using drugs, primarily because they refused to take drug screens consistently throughout the case. They also failed to submit to a second hair follicle test, despite being asked repeatedly and the hair follicle test being a requirement of each permanency plan. Both parents failed drug screens after the petition for termination was filed, and Mother claimed at trial that the Children had been exposed to methamphetamine not in parents' home, but in the home of an unknown friend. Father never completed any rehab and refused drug screens throughout the custodial period. Father would refuse to come out of the RV or would leave the premises when Mr. Doncouse arrived for drug screens. Nonetheless, the record shows that Mr. Doncouse made reasonable efforts to address the parents' substance abuse. On several occasions, Mr. Doncouse connected Mother and Father with in-patient programs and helped them make the necessary phone calls. At one point, Mr. Doncouse obtained a bed for Mother at Buffalo Valley, but Mother discharged herself after two days. When Father informed Mr. Doncouse that he did not want to do any rehabilitation programs because he was concerned about missing work, Mr. Doncouse offered to help Father find a facility with a work program. Father never followed up. While the record establishes that Mother at least attempted to address her substance abuse issues on a few occasions, Father has never done so.

In short, the parents' actions inspire little confidence that the Children have a safe, drug-free home to return to. While we share the trial court's concern over the parents planning to live with four teenagers in an RV, the Children's exposure to drugs is this Court's primary concern. A home in which children are likely to be exposed to drugs is not a suitable home for purposes of this ground, notwithstanding the physical aspects of the home itself. *See, e.g.*, *In re Porcalyn N.*, No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *7 (Tenn. Ct. App. May 21, 2021) ("The problem in this case was never lack of physical housing, but rather the fact that [f]ather's home is far from being free of drugs and domestic violence."); *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *10–11 (Tenn. Ct. App. May 8, 2018) (holding that mother failed to establish a suitable home where she procured an acceptable physical living location but ongoing relationship with child's father was likely to expose child to drug abuse and domestic violence); *In re Matthew T.*, 2016 WL 1621076, at *8 ("The evidence showed that [f]ather continues to use illegal drugs, and as long as that is the case, he cannot establish a suitable home for [s]on."). Nor is this Court confident that these issues will be addressed at an early date; indeed, Mother and Father had two years to address their substance abuse and have failed to do so. In the sense that their substance abuse was the primary barrier to reunification with the Children, the parents' failure to address this issue demonstrates an unfortunate lack of concern for the Children. Ultimately, and sadly, it appears the parents have prioritized drugs over the Children. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c).

Accordingly, DCS proved this ground for termination by clear and convincing evidence as to both parents, and we affirm the trial court's ruling.

### C. Substantial noncompliance with permanency plan

The next ground found by the trial court was substantial noncompliance with the permanency plan. Parental rights may be terminated for "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground is not established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted).

Importantly, the trial court concluded, in relevant part, as follows regarding this ground:

> [T]he Court concludes and finds that grounds for termination of parental rights do exist as to [Mother] and [Father], by clear and convincing evidence pursuant to Tenn. Code Ann. [s]ection 36-1-113(g)(2) **because neither of them have substantially complied with the responsibilities and requirements set out for them in the permanency plans** prepared in this matter over the course of this case.

(Emphasis added). We have previously explained, however, that the test for section 36-1-113(g)(2) is not whether a parent has substantially complied with a permanency plan, but whether the party seeking termination has proven, by clear and convincing evidence, that the parent is in substantial noncompliance with the plan. *See In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at *7 (Tenn. Ct. App. Dec. 9, 2021). Like the case at bar, in *Daylan D.* the trial court determined that "the [f]ather was not in substantial compliance with the permanency plans." *Id.* at *8. On appeal, we reasoned that the trial court reviewed this ground "through the lens of whether [f]ather had substantially complied with the permanency plans[,]" but that a parent's failure to substantially comply with the

- 15 -

permanency plans is not a ground for termination. *Id.* The trial court's findings as to section 36-1-113(g)(2) were thus vacated. *Id.*

We also noted, however, that "[i]n other situations where the trial court had an incorrect focus in the termination of parental rights context, we have held that vacatur was appropriate unless other grounds exist to terminate the parent's parental rights." *Id.* (citing *In re Travis H.*, No. E2016-02250-COA-R3-PT, 2017 WL 1843211, at *9 (Tenn. Ct. App. May 5, 2017); *In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *10 (Tenn. Ct. App. Oct. 21, 2015)). Accordingly, although a portion of the trial court's judgment was vacated, remand was unnecessary because other grounds for termination existed. *Id.*

The same is true here. While the trial court improperly applied section 36-1-113(g)(2) and that portion of its findings must be vacated, we decline to remand this case for reconsideration in light of other grounds for termination having been proven.

### D. Persistence of Conditions

Next, the trial court terminated the parents' rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3). Section (g)(3) provides that termination may occur when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3).

As we have previously explained:

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [ ] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, [2008 WL 4613576, at *20] (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016). Additionally,

this ground for termination may be met when either the conditions that led to the removal persist or "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" 36-1-113(g)(3)(A)(i). Thus, even if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown.

*In re Daylan D.*, 2021 WL 5183087, at *9.

In the present case, the Children were removed from the parents' custody by a court order entered in a dependency and neglect action, and the Children have been in DCS custody since May 1, 2019. Accordingly, we must determine whether conditions persist that prevent the safe return of the Children, whether the conditions are likely to be remedied at an early date, and whether a continued relationship with Mother and Father prevents early integration of the Children into a stable, permanent home. Tenn. Code Ann. § 36-1-113(g)(3). With regard to the foregoing, the trial court found:

At the time of this hearing the children have been in state custody for over 24 months. [Mother] is incarcerated and testified that even though she

- 17 -

had the opportunity for probation, an opportunity that would have given her a chance to visit with her children, she decided she would not be successful on probation and remained incarcerated. She further testified that she does not know how much time she will have to serve. Testimony by [Mother] and caseworker showed that [Mother] has not addressed her mental health issues and has not followed through with recommended intensive outpatient treatment. [Mother] has also not provided suitable housing for the children. [Mother] has not maintained contact with DCS; has not visited with the children consistently; and has not substantially complied with the tasks on the permanency plan.

[Father] has not provided suitable housing for the children; has not addressed his alcohol and drug issues; has not addressed his mental health issues and has not participated in the recommended intensive outpatient treatment. [Father] testified he called Centerstone a month or two ago, but did not follow through with treatment.

The conditions that caused the children to be removed from the parents' custody persist and were still in place at the time of the hearing.

Again, we agree with the trial court's conclusions. The Children were first removed from the parents because the entire family tested positive for methamphetamine after a hair follicle screening. Mother and Father continued to test positive for illegal substances throughout the case and on several occasions refused help to address this issue. Father was particularly recalcitrant about seeking any treatment. While we acknowledge that Mother eventually completed a thirty-day program, this was not done until nearly two years after the Children's removal, and one year after the petition for termination was filed. Further, Mother refused the follow-up recommendations from the program and testified that she would rather stay in jail and "flatten" her sentence than continue in a rehabilitation program. Mother conceded that she was concerned about going on probation because she tended to violate it.

In light of all of the foregoing, the Children would, in all probability, be subject to the same conditions if returned to the parents' custody. Tenn. Code Ann. § 36-1-113(g)(3)(i). Moreover, for all of the reasons already addressed, there is little likelihood the problematic conditions will be remedied at an early date. *Id.* § 36-1-113(g)(3(ii). While there is admittedly a dearth of proof regarding whether the Children are in pre-adoptive homes, the record at least establishes that the Children are in drug-free homes and attending school and therapy regularly. Further, the two oldest Children are now nearly adults. Whatever the Children's circumstances might be, the continuation of Mother's and Father's involvement in the Children's lives would be destabilizing. *Id.* § 36-1-113(g)(3)(iii).

As such, we conclude that DCS proved the ground of persistence of conditions by clear and convincing evidence. We therefore affirm the termination of Mother's and Father's parental rights pursuant to this ground.

### *E. Failure to manifest an ability and willingness to assume custody*

The final ground for termination found by the trial court was failure to manifest an ability and willingness to assume custody of the Children. This ground applies when:

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* The statute requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, *13 (Tenn. Ct. App. June 20, 2018)).

> Regarding the second prong of section 36-1-113(g)(14),
> [t[he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court found as follows regarding this ground for termination:

[Mother] and [Father] have not shown to the court a willingness or ability to care for their children or regain custody of them. Throughout the case [Mother] has continued to have legal issues. [Mother] has been incarcerated twice since the children were placed in state custody and was incarcerated at the time of this hearing. She had a violation of probation in 2019 and 2020 and a failure to appear in court. She refused probation even though she had that option. The testimony showed that [Mother] has not addressed her mental health or A&D issues. Further, that [Mother's] visitation has been inconsistent, and she has not supported her children financially by paying child support as ordered. [Father's] own testimony was that he has refused mental health and A&D services throughout the case and has been inconsistent with visitation.

Based on the facts set forth above, this Court concludes and finds that grounds for termination of parental rights do exist as to [Mother] and [Father] by clear and convincing evidence, pursuant to Tenn. Code Ann. 36-1-113[(g)(14)]. [Mother] and [Father] have failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody of the minor children and placing the children in their legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children.

For the most part, the evidence does not preponderate against the trial court's findings. While we have already determined that Mother did pay some support for the Children, the remainder of the trial court's findings as to this ground are supported by the record. Ultimately, Mother and Father failed to manifest a willingness to assume custody by failing to take meaningful steps towards resolving their substance abuse issues, thereby demonstrating a general lack of interest in actually obtaining custody of the Children. *See In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at \*9 (Tenn. Ct. App. Apr. 17, 2019) ("A lack of effort can undercut a claim of willingness."). Father never attempted rehabilitation and Mother completed a program only after the Children had been in custody for nearly two years. Mother did not complete the follow-up recommendations. Indeed, "[p]arents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child[,]" and the parents failed to take those steps here. *Id.* (citing *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at \*18 (Tenn. Ct. App. May 8, 2018)). Perhaps most telling was Mother's testimony at trial that she would rather stay in jail than continue working on her sobriety in a court ordered drug program. Although both parents testified at trial that they would like the Children returned to them and believed they could safely parent the Children, "we look for more than mere words" when evaluating willingness. *Id.* (citing *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at \*8 (Tenn. Ct. App. June 28, 2018)).

As to the second prong of section (g)(14), whether placing the Children in Mother's and Father's custody would "pose a risk of substantial harm to the physical or psychological welfare of the child[,]" the evidence supports the trial court's findings. The Children tested positive for methamphetamine while in the parents' custody; as addressed at length already, the parents did not take responsibility for this at trial and continue to struggle with substance abuse. Placing the Children in the parents' custody therefore "pose[s] a risk of substantial harm to the physical" welfare of the Children. Tenn. Code Ann. § 36-1-113(g)(14). Accordingly, this ground for termination was proven by clear and convincing evidence.

Having determined that statutory grounds for termination were proven at trial, we must consider whether termination of Mother's and Father's parental rights is in the best interests of the Children.

## II. Best Interests

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interest analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

At the time the petition for termination was filed, the relevant best interest factors were:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020). [6]

This list is non-exhaustive. *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

Turning to the factors, the trial court correctly determined that Mother and Father failed to make a meaningful adjustment to their circumstances, conduct, and conditions so as to make their home safe for the Children. *See* Tenn. Code Ann. § 36-1-113(i)(1). Mother and Father were in substantially the same situation at the time of trial as they were when the Children were removed. The circumstances were perhaps even worse because Mother was incarcerated and testified that she would rather stay incarcerated than go to a rehabilitation program. In the same vein, the record establishes that Mother and Father failed to make any lasting adjustments despite the efforts of DCS. *Id.* § 36-1-113(i)(2).

---

[6] We apply the version of the statute in effect at the time the petition for termination was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

On the other hand, Mr. Doncouse conceded that the parties and the Children have a loving relationship; this was borne out by both parents' testimony. It was also supported by DCS notes in the record, which provide that the Children were upset by the prospect of adoption and wanted the parents to complete their permanency tasks. *Id.* § 36-1-113(i)(4). Moreover, the Children spent the majority of their lives thus far with the parents, inasmuch as the Children were seventeen, sixteen, fifteen, and fourteen by the time of trial. This case is distinguishable from cases in which the children have only known their foster parents as their caretakers, and we must conclude that factor four militates against termination. Likewise, the record shows that when visitation did occur, it was positive. Although the parents' visitation was inconsistent at times, this is unsurprising given the COVID-19 restrictions and the fact that the Children were placed nearly two hours from the parents. Mr. Doncouse testified that the Children's foster parents reported Mother and Father attempted virtual visitation but often struggled with internet access. Under all of these circumstances, we also conclude that factor three weighs against termination. *Id.* § 36-1-113(i)(3).

The best interest factors also require us to consider the effect of a change in caretaker on the Children. *Id.* § 36-1-113(i)(5). Factor five is problematic in this particular case, however, because DCS offered little to no proof regarding the Children's experience in foster care. There was no testimony from the foster parents or the Children themselves, despite the Children's relatively advanced ages. Moreover, DCS notes in the record indicate that the Children were struggling in school and with anger problems during their placement. Also problematic is the fact that the Children were separated from one another, and COVID-19 restrictions limited their in-person visitation. Mr. Doncouse testified that the Children communicated over video game. As such, the very limited evidence before us regarding the Children suggests they were not faring particularly well in foster care. At the very least, we cannot conclude that removing them from their current placements would have a significant emotional or psychological effect on the Children; that evidence simply was not offered at trial. *Id.* § 36-1-113(i)(5). Under the circumstances, we cannot find that this factor favors termination.

Nonetheless, it is also true that the Children are at a significant risk of being exposed to drugs, particularly methamphetamine, if returned to Mother and Father. *See id.* § 36-1-113(i)(7). The Children tested positive for methamphetamine while in Mother's and Father's custody, and it was determined that the Children had suffered severe abuse. *Id.* § 36-1-113(i)(6). While it was undisputed that the Children tested positive for methamphetamine, the parents denied responsibility for this at trial. Mother stated that the Children were probably exposed to methamphetamine at a friend's house. Father refused to undergo any substance abuse programs, and Mother testified that she preferred to stay incarcerated as opposed to going through a court-ordered rehabilitation program. Based on all of the foregoing, DCS established that the Children suffered abuse and neglect at the hands of the parents and that it is extremely likely there is criminal activity in the parents' home. *Id.* § 36-1-113(i)(6) & (7). Mother's and Father's ongoing substance abuse issues

undoubtedly prevent them from providing the Children with stable care and supervision. *Id.* § 36-1-113(i)(8). Consequently, factors six, seven, and eight strongly militate in favor of termination.

Finally, Mother and Father paid some child support during the custodial period, although it is unclear how consistently. *Id.* § 36-1-113(i)(9). As such, factor nine does not strongly favor termination.

Considering all of the foregoing, the best interest analysis in this case is unusual. On one hand, the Children have spent most of their lives with the parents and with one another. It is undisputed that the family was bonded and, presumably, the separation has been difficult for the Children. Inasmuch as the Children are all old enough to have had meaningful relationships with both Mother and Father, logic dictates that the severance of ties with their parents would be challenging. On the other hand, the parents' overall living situation is unacceptable, and it is clear that Mother and Father still struggle with addiction. Mother's testimony about preferring to stay in jail as opposed to attending rehabilitation, and about the Children being exposed to methamphetamine at a friend's house is particularly disturbing and undermines any confidence this Court might have had in the safety and stability of the parents' home.

Consequently, we conclude that factors six, seven, and eight unequivocally outweigh any factors that militate against termination, and termination of Mother's and Father's parental rights has been clearly and convincingly shown to be in the Children's best interests. *See id.* § 36-1-113(i)(6)–(8). However difficult the termination may be for the Children, the alternative is worse. Mother and Father simply cannot safely parent the Children, as their conduct throughout the custodial period establishes that they still prioritize their substance abuse. Under the circumstances, this rises to the level of clear and convincing evidence that termination is in the best interests of the Children. *See In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017) ("Depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.") (citing *In re Audrey S.*, 182 S.W.3d at 878). We affirm the trial court.

## CONCLUSION

The judgment of the Juvenile Court for Dickson County is affirmed and remanded for proceedings consistent with this opinion. Costs of this appeal are assessed to appellants Taleada K. and Lashaun K., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE